---

## Case No. 18,219.

ZOLLINGER v. The EMMA.

[See Case No. 18,218.]

---

## Case No. 18,220.

### The ZONE.

[22 Law Rep. 725; 2 Spr. 19.] [1]

District Court, D. Massachusetts. March, 1860.

LIBEL AGAINST VESSEL—DAMAGE TO CARGO.

1. The French Code de Commerce does not differ from the general maritime law, in respect to liens on the ship for damage to the cargo.

2. On trial of a libel against a ship, to recover damage to cargo proved to have been shipped sound, and delivered damaged, the burden of accounting for such damage is on the claimants.

[1] [2 Spr. 19, contains only a partial report.]

This was a libel in rem to recover damage to a quantity of almonds shipped under a French bill of lading, of which the following is a translation. "Marseilles, February 6, 1858. Shipped in the name of God and of good luck, at the port and harbor of this city, by Rabaud Bros. & Co., for account of whom it concerns, in the American ship called the Zone, commanded by Captain Wells, to be conveyed and transported (God assisting) to New Orleans, and delivered to order, or to whomsoever the below-mentioned merchandise shall be for; marked as follows, viz.: 'G. H.' Four hundred and six bags almonds in the shell, weighing in the whole twenty thousand three hundred kilogrammes, K. 20,300,—making thirty one tons $230/1000$. And on receipt thereof, well-conditioned and free from wet or damage, freight shall be paid, six dollars, with ten per cent. primage per ton. Weight, contents unknown to (Signed) John C. Wells." The testimony of sixty-eight witnesses was put into the case, the trial of which lasted six days.

2 [The libellants, who are residents of Barcelona, in Spain, by their agents at Marseilles, shipped on board the Zone about thirty tons of soft-shelled almonds to be delivered at New Orleans. The almonds had been purchased at Alicante, and carried thence, by water, to Marseilles. The persons who packed the almonds at Alicante, the master of the steamer that carried them to Marseilles, and the persons employed in transshipping them at Marseilles, severally, testified that they were in good condition when they passed through their hands. The bills of lading signed by the master were not in the ordinary form. They did not contain any admission that the almonds were in good condition when received, nor any undertaking to deliver them in good order; nor did they contain the usual exception of the perils of the seas; but they provided that, upon the delivery of the almonds in sound condition at New Orleans, the stipulated freight should be paid. The master and mate of the Zone testified that the almonds, so far as they knew or saw, were in good condition when received at Marseilles. They saw them, however, only in the imperfect light of the hold of the vessel, and neither of them was acquainted with the article; and they both testified that when taken out of the vessel at New Orleans they were in as good order as when received, except about a dozen bags, which had been rat-eaten, and the bagging of a part of the rat-eaten bags, which had fallen down against the ballast, was rotten from humidity. On the voyage, the vessel encountered strong gales and a "short heavy sea," and carried away some of her lighter sails and spars. She was, however, very tight, the water never rising in her more than eleven inches, and never coming up within several inches of her ceiling. On arriving at New Orleans, the almonds were taken out of the ship, and about half of them were sent to the store of a merchant who had bought them to arrive; he then refused to receive any more, alleging that they were damaged. The consignees thereupon took the remainder into their own store, and had them all examined by two port-wardens, who reported that they found them generally stained and mouldy, and thereby rendered unmerchantable, and ordered them to be sold at public auction. They were sold accordingly, and bought in by the merchant who had before bought them to arrive, for about half the price he had agreed to pay for them. The master of the vessel was not notified to be present at the examination by the port-wardens, though he was notified afterwards of the intended sale. The testimony as to the actual condition of the almonds, when they came out of the vessel at New Orleans, was very conflicting. The merchant who had bought them to arrive, and the consignee, both testified that many of them were actually wet, and that more than half of them showed signs of having been wet or were actually wet. The marine inspector, who was also agent of the insurance company that insured them, saw part of them in store, part in the hold of the vessel. He said he found them "stained, mouldy, and diseased, and musty; that they had been wet, and part of them were still damp." Two of the employees of the consignees testified that they were wet, and "the greater part of them perfectly black." Other employees of the consignees testified that they were not then wet, but appeared to have been wet, and were then damp. The two port-wardens, who examined them after they had been taken out of the vessel, and who ordered them to be sold, testified that they found them "generally stained and mouldy." Some of them appeared to be damaged by salt water and by dampness and humidity. One of them spoke of finding stained almonds in bags that showed no external appearance of damage. One of them spoke of the bags as appearing "rusty." One employee of the consignees testified that he opened three or four bags, and found them wet and mouldy. A dealer in almonds, who attended the auction sale, and saw these almonds there, said they were "stained and black, and appeared to have been wet." Another said, they "evidently had been damaged by salt water." The libellants also called three stevedores, two Italians and one Spaniard, who testified that almonds should not be stowed in the hold of a double-decked vessel, and, if so stowed, there should be under them at least two feet of ballast, and twenty inches of dunnage on top of that. Several of the libellants' witnesses attributed the damage to bad stowage and insufficient dunnage. Two of them thought the damage had been caused by blowing. One or two suggested the steam of the hold as the cause, and there was no oth-

er cause of damage than the above suggested by any witness. The almonds were in fact stowed in the lower hold of the ship, a part between the fore and main mast, and the remainder between the main and mizzen mast; other cargo being stowed forward and aft of and between the piles of almonds. The vessel was ballasted with shingle ballast, thirty inches in depth at least, and coming above the top of the rider keelson, and on top of this was dunnage of wood.

[There was some controversy as to the thickness of the dunnage, but no witness made it less than three or four inches. On behalf of the claimant many witnesses were called of large experience. port-wardens, ship-masters, and merchants, all of whom testified that the place where the almonds were stowed was the best place in the ship to stow cargo liable to be damaged by seawater, and that the dunnage under this cargo was ample; that a single board over this ballast, and on the sides of the ship, with four or five inches in the bilge, was, in their opinion, sufficient dunnage, and all that usage required. The claimant also proved that the ship was rated A 1; that she delivered her outward cargo at Gibraltar, in perfect order; that she brought to New Orleans other almonds, in bales, stowed alongside in part, and in part on top of these said to be damaged, which were delivered in perfect order, except only a slight staining on the bagging of a few bales; that, at New Orleans, immediately after taking out the cargo, a cargo of cotton was taken in, and stowed directly upon the ballast, which had not been moved or changed, and came out in Boston dry and unstained. The discharging clerk, who was present nearly all the time the ship was unlading, testified that the almonds came out in good order, except that a few bags, not over twelve in all, were rat-eaten, and the bagging of five of these, that had fallen down upon the ballast or against the sides of the vessel, was stained and rotten by "humidity." A port-warden who was present when the hatches were taken off, and two or three times afterwards, on account of the damage above named, testified that he saw no other damage to the almonds than that above stated; that he saw no appearance of seawater having touched any part of the cargo; and that he found the ship an unusually dry ship. The stevedore who unloaded the ship in New Orleans, his foreman, and two or three assistants, testified that they saw no appearance of wet on the almonds. The stevedore further said, he found some bags of almonds with dry stains on them, mixed indiscriminately among the bright bags. Two persons in the employ of the consignees were in the hold of the vessel before the almonds were taken out. One of them drew samples from the almonds while in the vessel, and neither of them discovered any damage until the almonds were taken out of the ves-

sel. The claimant put in the testimony of three Boston dealers in almonds, to the effect that salt water always rots the bags and discolors the meat of the nut as well as the shell, while fresh water affects only the shell. It was not contended that these bags were rotten, except the few above named; and several of the witnesses for the libellants testified that they found the shell of these almonds discolored, while the meat was white and sweet, and they gave this as their reason for the belief that the almonds were injured on the voyage. The claimant further proved that, for two weeks immediately preceding the shipping of these almonds, the weather was rainy with high winds, and that another cargo of almonds, shipped from Marseilles to Boston about the same time, was mouldy and discolored, while the bags showed no appearance of damage.

[The claimants contended: 1st. That the contract, having been made in France, was to be governed by the law of France, and that by the law of France the ship is not liable for damage to cargo unless the damage is occasioned by the fault of the master or crew. 2d. That the fair result of the foregoing evidence was that the almonds did not come out of the vessel wet; that the only external signs of damage were stains on the bags; that the stains were not so dark in color as to attract the attention of persons not acquainted with the usual appearance of bags of almonds; that the testimony demonstrated that every usual and necessary precaution had been taken for the preservation of the almonds; that the fact proved by the libellants' witnesses, that some bags which appeared bright on the outside contained stained almonds, the position in which the stained bags were placed in reference to the bright bags, the fact that the bags were not rotten, the nature of the damage to the nuts, the dryness of the vessel and her ballast after her cargo was taken out, the fact that the ship made no water on the voyage, and the fact that other almonds stowed with these came out sound. proved, conclusively, that the damage had not been done on board the ship, or, at all events, not by any of the causes for which the ship is responsible under the general maritime law; that the evidence that the cargo came on board in good condition was by no means satisfactory; that the master of the steamer that carried the almonds from Alicante to Marseilles had not opportunity to know what he testified to be true. and the persons who saw them at Marseilles had no duty to do which would lead them to examine carefully; that the clear result of the whole evidence was, that either the almonds came on board in bad condition or not in condition to bear the voyage, or. if injured on the voyage, it was by "perils of the sea." 3d. That, as matter of law, damage to cargo by blowing or steaming, the only means

of damage suggested by the libellants' witnesses, in a vessel well stowed and dunnaged, is damage by perils of the sea.

[The libellants contended: 1st. That the contract was to be governed by the laws of the United States; because its performance was to be completed there, and, if not so, that the law of France did not differ from the law of the United States, as to the extent of the lien upon a vessel for damage to cargo. 2d. That it was proved that the almonds came on board in good condition, and came out damaged; that the burden of proof was upon the claimants to account for this damage, and to show that it was occasioned by a peril of the sea, or by some other cause for which the ship was not responsible; and that, in the conflict of testimony in this case, the claimants had not sustained the burden of proof; that damage by blowing could not be considered damage by peril of the sea, under the facts and circumstances of this voyage. The trial lasted six days, and the testimony of sixty-eight witnesses was taken orally, or by depositions.] [2]

B. R. Curtis and C. P. Curtis, Jr., for libellants.

John C. Dodge, for claimants.

SPRAGUE, District Judge. The libellants claim as owners and shippers of the almonds mentioned in the bill of lading, for damage to their property. The claimants have made two objections to the maintenance of this suit in the name of the libellants; first, that the property belonged to the consignees, Messrs. Cusack & Co. of New Orleans; and second, that the suit was commenced without authority from the libellants; but I am satisfied upon the evidence that the libellants were the owners of the property, and that the suit was rightfully brought, and is rightfully prosecuted by them.

The first question to be decided is whether the rights of the parties are to be settled by the French Code de Commerce, or by the general maritime law. It is argued, on behalf of the claimants, that as the contract of shipment was made in Marseilles, the law of France controls it, and establishes their duties and liabilities. And they allege that by the French Code (section 191), no lien on the ship is given, for damage to cargo, unless caused by the fault of the master or crew. I do not find it necessary to decide this question, for the reason that I do not think I am authorized to infer from the French Code, that it differs, in respect of liens for damage to cargo, from the general maritime law. I think, in the first place, that it is fairly to be presumed that a commercial code of so commercial a nation as France, would not differ from the general maritime maxim, "that the ship is bound to the goods, and the goods to the ship." The Code is the only

evidence of the law offered. No testimony of French jurists is in the case, and I am left to form my own judgment of the law from the Code itself. The section (191) insisted upon by the claimants does not profess to create liens, but only to marshal certain liens elsewhere declared to exist. We must look elsewhere for the creation of liens on ships for damage to cargo.[3] Under the chapter of the Code treating of charter-parties, contracts of affreightment, and freightings ("Des chartres-parties, affretemens ou nolissemens"), this subject is treated. The 280th section is as follows: "The ship, her tackle and apparel, the freight and the cargo, are respectively bound to the performance of the agreements of parties." The claimants insist that this section is limited to charter-parties, or to contracts for the hiring of a specific portion of the ship. It would be very extraordinary if it were so limited, and would interfere very materially with the powers of the captain to load his ship in such a manner as to render her seaworthy. Some goods require to be put at the bottom, and others at the top of the cargo. Too much dead weight on the bottom will make the ship labor. Too little will make her crank. Now, if the hirer of a portion of a ship should have the right to insist upon having that portion established by metes and bounds, either perpendicularly or horizontally, it would follow that he would have the right to stow his cargo as he chose, and in such proportions as he preferred. And in case there were several such partial hirers, the control of the stowage would be altogether taken away from the master. But it is said that there is a special chapter of the Code, treating of bills of lading, in which no mention is made of any lien. A bill of lading is not inconsistent with there being also a charter-party, or a contract of affreightment. A bill of lading is evidence of a contract, but it does not necessarily constitute the whole contract. If section 191 is the only one giving a lien for damage to cargo, then it would follow that there is no lien on the ship for damage arising from the fault of the owner. The ship might be unseaworthy, and the owner know it, and yet no lien for the damage caused thereby. This is not to be supposed, and I should not adopt the construction of the claimants' counsel, without further proof that such is the meaning of the French Code. Believing that the French law does give a lien on the ship in accordance with the general maritime law, it does not become necessary for me to decide by which of the two this contract is governed.

---

[2] [From 2 Spr. 19.]

[3] [The authority of the master to bind the ship and her owners is determined by the law of the country to which the ship belongs. Pope v. Nickerson, Case No. 11,274; The Bahia, 1 Brown. & L. Adm. 292; Peninsular & Oriental Steam Nav. Co. v. Shand, 3 Moore, P. C. (N S.) 272.]

Is the ship liable? In the first place, were the goods damaged when delivered in New Orleans? In regard to twelve bags, damaged by rats and rotten from humidity, there is no controversy. As to the residue, the depositions of the consignees, of the person to whom they had been sold to arrive, and who rejected them as damaged, of the port-wardens and marine inspector who examined them, and of others who saw them,—all show that they were damaged. Notice was given to the captain and to the consignees of the ship in New Orleans, and in the newspapers, that the almonds would be sold at auction, and they were so sold for half the value of sound ones. The captain was notified of the damage, and there was an examination of the almonds in his presence. He was requested to extend a protest, to enable the consignees to recover of the underwriters; but he declined to do so, on the ground that he had had no bad weather on his voyage. On the evidence, I cannot doubt that the almonds were damaged very much beyond the extent admitted by the claimants. The almonds having been shown to be damaged when delivered, and the master having signed a bill of lading implying that they were in apparent good condition when shipped, the burden of proof is on the claimants to show why they did not arrive in good condition. In this bill of lading, it is true that there is no express admission of their reception in good condition; but it is therein provided, that "on their delivery in New Orleans without wet or damage freight shall be paid," and this imports that they were without "wet or damage" when shipped. It is conceded by the libellants, that although the bill of lading does not in terms except the dangers of the seas, this exception is implied.

It is contended that the almonds must have been wet or damaged before going on board in Marseilles. To meet this, the libellants have produced the testimony of the persons in Spain who purchased the almonds, dried them in a granary, put them into bags, put them on board the steamer for Marseilles, and of the captain of the steamer himself. They have also produced the testimony of the shippers in Marseilles; of their clerks, draymen, and lighterman, by whom the almonds were examined and put on board the ship; and by this complete chain of testimony, exhausting the sources of evidence, it is shown that they were handled only in fair weather, and were in a sound and dry state when put aboard. Furthermore, the mate testifies that the weather was fine the day they came aboard; that he received and saw them, and reported them in good order to the captain for him to sign the bill of lading. He superintended the stowage, and it was his duty to see and report whether they were wet or not.

In reply to this direct evidence, the claimants say that the almonds must have been damaged before coming on board, because

the injury could not have arisen on board the vessel. They show that the vessel was properly dunnaged according to usage in Boston; that the ballast was some two feet deep, and that there was sufficient dunnage to protect the cargo from water from the bottom, and that there was but little water in the hold. But there is evidence that these bags, or the greater part of them, were wet when taken out; that there was wet then in the vessel and that some of them lying against the side of the vessel were rotten from humidity. Have the claimants shown how this damage was caused? Was it by "blowing?" This may happen where there is but little water in the hold, but from the evidence it would seem that the bags were too generally damaged to have been wet from this cause, which would be more likely to wet only the outer tiers of bags. Was it from a leak in the deck? The mate says the upper deck was tight; but in fact the lower deck was not tight. It cannot be that the goods came on board dry, were delivered wet, and were not damaged while in the ship. Some one of these three propositions must be untrue.

Now, the evidence shows satisfactorily that the goods were wet and damaged when delivered at New Orleans, and the bill of lading admits that the sacks appeared externally to be in good order when taken on board in Marseilles. The burden of proof is then on the claimants to show what caused the damage. Theories may be formed as to the cause of damage, and one theory which is no more improbable than another is, that water may have got in between decks during the voyage. It must be borne in mind, that one of the reasons for casting the burden of proof of the cause of damage (after the damage itself has been shown) upon the ship-owner is, that as to what takes place during the voyage no one except his agents can testify. This burden of proof does not allow of a conclusive inference that the damage must have arisen before shipment, because the ship was tight and well dunnaged and that the ship-owner will be relieved of his liability by such inference. The burden of proof requires that the owner should go farther, and satisfy the court that the damage arose from one of the causes excepted, —anything short of this will not relieve him of his responsibility. I cannot say that the claimants have done this, because my mind is left in a state of uncertainty as to the cause of the damage, and I therefore must order a decree to be entered for the libellants. In regard to the amount of the decree, the auction sale must have great weight in determining the value of the almonds in New Orleans, as it appears to have been a fair public sale, of which the captain and the consignees of the ship were notified, and which was abundantly advertised. There were several dealers and bidders present, and there is no evidence of any unfairness.

If the parties do not agree as to the amount of damages, the case may be sent to an assessor.